**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

MATHEW G NELLESSEN (M45988),    )
        )
        **Plaintiff,**        )
        )    **Case No. 23 C 3278**
        **v.**        )
        )    **Hon. Rebecca R. Pallmeyer**
EDCAR WALKER,        )
        )
        **Defendant.**        )

## MEMORANDUM OPINION AND ORDER

Plaintiff Mathew Nellessen, a prisoner in the custody of the Illinois Department of Corrections, has brought this action under 42 U.S.C. § 1983 against Correctional Officer Edcar Walker. Nellessen alleges that Walker used excessive force against him during a "cell extraction" on October 3, 2022, when Nellessen was housed at the Joliet Treatment Center. Defendant has moved for summary judgment. For the reasons set forth below, that motion [111] is granted in part and denied in part. Plaintiff's motions seeking additional review of the relevant video evidence [128] [131] [137] are denied; Plaintiff's first motion to strike [132] is denied; his second such motion [136] is granted; and Plaintiff's multiple notices of his recent address change, each filed as "motion for status" [151] [152], may be terminated from the docket, as the Clerk has updated his address. This case is set for a telephone status hearing on 4/1/2026 at 9:30 a.m. to discuss next steps in this case.

## PROCEDURAL STANDARDS

Local Rule 56.1 governs the procedures for filing and responding to motions for summary judgment in this court. Because Plaintiff is proceeding *pro se*, Defendant served Plaintiff with a "Notice to Unrepresented Litigants Opposing Summary Judgment" [114] as required by Local Rule 56.2. As explained in that notice, in opposing summary judgment, Plaintiff "must file, as separate documents" a response to Defendants' statement of material facts, a statement of additional facts, evidentiary material, and a memorandum of law. *Id.*

The parties have complied with the rules: Defendant submitted a Local Rule 56.1(a)(2) statement of material facts ("Def.'s SOF" [112])), to which Plaintiff responded ("Pl.'s SOF Resp." [130]). Plaintiff likewise submitted a Local Rule 56.1(b)(3) statement of additional material facts ("Pl.'s SOAF" [133]), to which Defendant responded ("Def.'s SOAF Resp." [142]). Plaintiff has also submitted a sur-reply ("Pl.'s Sur-Reply") [147]). And both parties cite extensively to the record, as required by Local Rule 56.1.

The court notes, however, that some of Plaintiff's responses incorporate nonresponsive additional facts or legal argument, both of which are improper under Local Rule 56.1(e)(2).[1] The district court is not required to "wade through improper denials and legal argument in search of a genuinely disputed fact." *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) (citation omitted). Accordingly, where Plaintiff has not properly disputed a fact that is supported by Defendant's cited materials, the court will accept that fact as true without separately ruling on every "dispute" identified by Plaintiff. *Id.* At the same time, the court will generously construe the facts identified by Plaintiff to the extent they are supported by the record. *See Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016) (courts may construe *pro se* submissions leniently).

Defendant has also submitted for the court's review two video recordings of the October 3, 2022, cell extraction and the medical care Plaintiff received immediately afterwards. "[W]here a reliable videotape clearly captures an event in dispute and blatantly contradicts one party's version of the event so that no reasonable jury could credit that party's story, a court should not

---

[1] By way of one example, in response to Defendant's assertion that "[t]here was a bottle in Plaintiff's chuckhole when the ERT entered the hallway in front of Plaintiff's cell to begin the cell extraction," (Def.'s SOF ¶ 11), Plaintiff responded by admitting "There was a 'bottle' on [the] chuckhole" while further "disputing" "Plaintiff did not put bottle on chuckhole, nor throw it at staff." (Pl.'s SOF Resp. ¶ 11 (emphasis in original) (citations omitted).) For another example, in response to a number of Defendant's facts, Plaintiff simply argues, without any evidentiary basis, that the underlying incident reports cited by Defendant were fabricated. (*See, e.g.*, Pl.'s SOF Resp. ¶ 20.)

2

adopt that party's version of the facts for the purpose of ruling on a motion for summary judgment." *McCottrell v. White*, 933 F.3d 651, 661, n.9 (7th Cir. 2019) (citing *Scott v. Harris*, 550 U.S. 372, 380-81 (2007)). Put another way, the court defers to the video footage in instances where it "firmly settles a factual issue." *Smith v. Kind*, 140 F.4th 359, 363 (7th Cir. 2025); *see also Horton v. Pobjecky*, 883 F.3d 941, 944 (7th Cir. 2018) ("When video footage firmly settles a factual issue, there is no genuine dispute about it, and we will not indulge stories clearly contradicted by the footage."). Following this precedent, this court views the facts related to the October 3, 2022, cell extraction in the light depicted by the video evidence, to the extent clear video footage exists.[2] *See Lopez v. Sheriff of Cook Cty.*, 993 F.3d 981, 984 (7th Cir. 2021) (court may "take stock of what the video evidence shows without favoring [the non-movant] where the video contradicts his view of the facts"). The parties remain free to offer "competing interpretations" of the video evidence, and the court will "disbelieve the non-movant's presentation of the facts only where the video 'utterly discredit[s]' that rendition of the facts." *Raddant v. Douglas Cnty.*, ___ F.4th ___, No. 24-3293, 2026 WL 699609 (7th Cir. Mar. 12, 2026) (quoting *Kailin v. Vill. of Gurnee*, 77 F.4th 476, 481 (7th Cir. 2023)).

---

[2] The parties acknowledge that, at times, the view from the camera is blocked by Plaintiff's cell door and/or members of the Emergency Response Team. (*See* Pl.'s SOAF ¶¶ 19–20.) Plaintiff's concerns regarding the authenticity of the video recordings were previously rejected by the court, finding no indication that any portion of the videos was edited, altered, or otherwise tampered with. (*See* [99, 116, 120].) Plaintiff's various motions seeking another opportunity to review the video evidence are denied without prejudice. Plaintiff appears concerned about his ability to provide an "exact timestamp within the video footage of when precisely [certain facts] occur." ([131]; *see also* [128, 137]. The court views Plaintiff's submissions as complete even without specific references to timestamps, and will liberally construe Plaintiff's citations to the video evidence. Plaintiff will have additional opportunities to view the video footage if this case proceeds to trial.

**FACTS**

The following facts are taken from the parties' Local Rule 56.1 submissions, as well as the video recordings of the October 3, 2022 cell extraction.

Plaintiff was housed at the Joliet Treatment Center ("JTC") during all times relevant to this lawsuit.[3] (Def.'s SOF ¶ 1.) On September 25, 2022, the JTC's Adjustment Committee found Plaintiff guilty of three disciplinary offenses and sentenced him to seven days in segregation. (*Id.* ¶ 2.)

On the morning of October 3, 2022, Plaintiff refused a direct order to "cuff up" so he could be escorted to restrictive housing. (*Id.* ¶ 4.) The JTC Emergency Response Team ("ERT") was activated later that same day to remove Plaintiff from his cell (a "cell extraction") and move him to a restrictive housing unit cell. (*Id.* ¶ 3.)

The ERT was comprised of six members, including Defendant Walker. (*See* Def.'s Ex. 11 [129], S8870001 ("Video 1") at 0:32-1:00.) Walker was assigned to the ERT's "shield position" for the October 3, 2022, cell extraction. (Def.'s SOF ¶ 16.) In that position, Walker's duties were: (1) to use a shield and be the first member to enter the cell; (2) to secure the individual in custody against the wall, bed, or floor; (3) to secure the individual's head and upper body; and (4) to orally communicate with the individual in custody. (*Id.* ¶ 42.) Other members of the ERT were assigned the position of "Restraint One" and "Restraint Two" for the cell extraction on October 3, 2022. These officers were tasked with securing the arms and hands of the individual

---

[3]     Neither party explicitly addresses Plaintiff's inmate status in their briefing before the court. The court takes judicial notice of the fact that Plaintiff has been serving a criminal sentence in the custody of the Illinois Department of Corrections since 2014. *See* Individual in Custody Search, https://idoc.illinois.gov/offender/inmatesearch.html (last visited Mar. 11, 2026). Because Plaintiff had already been convicted and sentenced at the time of the underlying events, the Eighth Amendment's protections against "cruel and unusual punishment" apply. *See Lewis v. Downey*, 581 F.3d 467, 473-74 (7th Cir. 2009).

in custody and with placing restraints on the individual's wrists and ankles. (Pl.'s SOAF ¶ 7; *see also* Pl.'s AF Ex. 5 ("IDOC Administrative Directive 05.01.173") [135] at 45-52.)[4]

Plaintiff's assigned cell on October 3, 2022 had a window that allowed Plaintiff to see the hallway outside his cell. (Def.'s SOF ¶¶ 7-8.) Plaintiff's cell door also had an opening (referred to as a "chuckhole") that was used for delivery of meals and mail. (*Id.* ¶ 9.) Plaintiff was expecting the cell extraction and prepared for resistance by covering the chuckhole with his mattress, covering his face with a "muscle shirt," and wearing gloves to shield his body and prevent the ERT from spraying Plaintiff with pepper spray. (*Id.* ¶¶ 10, 12; Pl.'s SOAF ¶ 37.)

Prior to conducting the cell extraction on October 3, 2022, the ERT had learned that Plaintiff had "potential fecal matter," was threatening staff, and was "being aggressive." (Video 1 at 0:23-0:30; *see also* Def.'s SOF ¶ 32.)[5] Video evidence shows that, immediately prior to the ERT's entering the hallway in front of Plaintiff's cell, a bottle was sitting on the ledge of Plaintiff's chuckhole. (Def.'s SOF ¶ 11; *see also* Video 1 at 3:00.) At some point while the ERT was assembling directly outside of Plaintiff's cell, the bottle was knocked over and its (apparently liquid) contents can be seen on the floor outside Plaintiff's cell. (Video 1 at 3:19; *see* Pl.'s SOAF

---

[4]     Plaintiff's list of supporting exhibits is set forth in his statement of additional facts, [133] at 1-2, but the exhibits themselves are attached to his memorandum of law without any further identification as "AF Ex. 1," AF Ex. 2," etc. (*See* [135] at 34-70.) The court nevertheless adopts Plaintiff's naming conventions for ease of reference.

[5]     Plaintiff admits that team lead Corey Walker told the ERT that Plaintiff may have fecal matter, was threatening staff, and was acting aggressively in his cell, but denies that he engaged in the alleged conduct, and objects that this reported information has not been independently verified and should be stricken as inadmissible hearsay. (Pl.'s SOF Resp. ¶ 32.) The court agrees that the cited evidence cannot be used "to prove the truth of the matter asserted." FED. R. EVID. 801(c)(2); 802. On the other hand, "[a] witness's statement is not hearsay if the witness is reporting what he heard someone else tell him for the purpose of explaining what the *witness* was thinking, at the time or what motivated him to do something." *United States v. Leonard-Allen*, 739 F.3d 948, 954 (7th Cir. 2013) (emphasis in original). Defendant therefore may rely on the cited evidence to show his subjective motivation or state of mind as the ERT prepared for the cell extraction.

¶ 13.)  As reflected in video evidence, at a later point in the extraction, multiple ERT members can be heard on the video stating that the floor outside Plaintiff's cell was "slippery."  (Def.'s SOF ¶ 26; Video 1 at 7:42-7:43.)[6]  How the bottle was knocked over, and whether Plaintiff "threw" the bottle at the ERT, are disputed.  (Pl.'s SOAF ¶ 13; Def.'s SOAF Resp. ¶ 13.)

After arriving at Plaintiff's cell, Defendant placed his shield over Plaintiff's open chuckhole. (Def.'s SOF ¶ 18.)  The parties dispute whether Plaintiff actively pushed back against the shield while it was covering the chuckhole.  (*See* Def.'s SOF ¶ 19; Pl.'s SOAF ¶ 17.)  The video evidence shows the shield bowing under pressure, although Plaintiff cannot be seen physically touching the shield.  (Video 1 at 3:36-3:43.)

The ERT remained assembled in the hallway directly outside of Plaintiff's cell for approximately four minutes before locking the chuckhole and moving to open Plaintiff's cell door. (Video 1 at 3:18-7:25.)  During this time, the ERT gave at least three direct orders for Plaintiff to "turn around and cuff up" or simply to "cuff up."  (Def.'s SOF ¶ 15; *see also* Video 1 at 3:18-7:24.) Plaintiff did not comply with these orders, and his masked face can be seen through the window to his cell, where he stood facing the officers immediately on the other side of his cell door.  (*Id.*)

The parties dispute whether Plaintiff was holding a second cup filled with substance while the ERT members stood directly outside his door.  (*See* Def.'s SOF ¶ 20; *see also* Pl.'s SOAF

---

[6]      Plaintiff argues throughout his briefing that certain facts should not be credited because they are either (a) not mentioned at all in the six incident reports cited by Defendant or (b) described inconsistently across all six reports.  (*See, e.g.*, Pl.'s Memo [135] at 12 (identifying differences among the reports in support of Plaintiff's argument that "the incident reports written by each participating [ERT] member, including the Defendant, are immensely falsified").) Similarly, Plaintiff argues that facts included in the incident reports but not clearly captured by the video evidence cannot be credited.  (*See, e.g., id.* at 6 ("while the Defendant, amongst others, falsely claim[s] as well that the Plaintiff threw this 'cup' at them, . . . [v]ideo footage will not portray this as occurring either").  These arguments go to the weight of the evidence, however, and thus cannot be considered at the summary judgment stage.  *See Wood v. Security Credit Services, LLC*, 126 F.4th 1303, 1314 (7th Cir. 2025) ("At summary judgment, we cannot pick a side on the conflicting evidence.").  In any event, whether the bottle fell from the ledge or was thrown from it is not dispositive here.

¶ 12.)   Plaintiff contends that he could not have been holding a cup, because he was holding his mattress over the chuckhole during the entire time the ERT was outside his cell door.   (Pl.'s SOF Resp. ¶ 20.)   It is undisputed, however, that ERT officers gave Plaintiff multiple direct orders to "drop the cup" as they prepared to enter Plaintiff's cell.   (Def.'s SOF ¶ 21; *see* Pl.'s SOF Resp. ¶ 21.)

The ERT administered four bursts of pepper spray into Plaintiff's cell before opening his cell door, interspersed between the ERT's shouted orders for Plaintiff to "cuff up" and "drop the cup."   The first burst of pepper spray was administered through the cord opening in the utility closet adjacent to Plaintiff's cell.   (Def.'s SOF ¶ 22.)   Three more bursts of pepper spray were administered through the chuckhole in the door to Plaintiff's cell.   (*Id.* ¶¶ 23–25.)   The ERT did not wait "5 minutes between each burst of pepper spray" to see if Plaintiff would comply and cuff up, as instructed by IDOC Administrative Directive 05.01.173.   (Pl.'s SOAF ¶ 38.)   Instead, approximately three minutes elapsed during the time from the first burst of pepper spray to the time the ERT closed the chuckhole and began moving to open Plaintiff's cell door.   (Video 1 at 4:32-7:25.)

As the door to Plaintiff's cell was opened, there was a scuffle in the doorway.   It is undisputed that team lead Corey Walker[7] sprayed Plaintiff directly with his canister of pepper spray as Plaintiff's cell door was opened.   (Pl.'s SOAF ¶ 40; Def.'s SOAF Resp. ¶ 40.) Defendant contends that, during this time, Plaintiff was "pushing out of the cell and trying to grab [the] ERT Leader's pepper spray can."   (Def.'s SOF ¶ 27.)   Plaintiff disputes this.   (*See* Pl.'s SOF Resp. ¶ 27; Pl.'s SOAF ¶ 21.)   What is clear from the video evidence is that Plaintiff physically engaged with the ERT members for approximately seven seconds in the cell doorway;

---

[7]    To avoid any confusion between Corey Walker (team lead) and Defendant Edcar Walker (in the shield position), the court uses Corey Walker's full name throughout this opinion.

what is less clear is whether Plaintiff actively pushed to get out of his cell or pushed back against the ERT members in an effort to block them from entering his cell.   (Video 1 at 7:51-7:58.)

Plaintiff's asserts that he "held his mattress the entire time prior to the entering of his cell by ERT" (Pl.'s SOAF ¶ 37), and Defendant admits this (Def.'s SOAF Resp. ¶ 37), but the assertion is directly contradicted by the video evidence.   The door to Plaintiff's cell blocks any clear view of Plaintiff's hands during most of the scuffle.   Views of his torso and upper arms confirm, however, that Plaintiff reached forward through the doorway of his cell and made physical contact with the ERT members and/or their equipment while his cell door was cracked open.   (Video 1 at 7:51-7:58.)   For a brief moment, the video also clearly shows Plaintiff's left hand on Corey Walker's cannister of pepper spray.   (Video 1 at 7:54.)

Because he held the assigned shield position, Defendant Edcar Walker was the first ERT member to enter Plaintiff's cell during the cell extraction.   (Def.'s SOF ¶ 16.)   The parties dispute what happened in the initial moments after the team entered Plaintiff's cell.   The video evidence shows that, in a period of approximately eight seconds, Plaintiff goes from a standing position to lying prone face down on the ground (or possibly face down on his mattress) with multiple officers holding him down.   (Video 1 at 7:58-8:06; *see also* Def.'s SOF ¶¶ 27, 29.)   The scene is chaotic. Whether Plaintiff was thrown or pushed to the ground is not clear from the video, nor is there a clear view of Plaintiff's head or face during this eight-second video segment.   There is likewise no video footage showing Defendant's arms, hands, or shield in the eight seconds after Plaintiff's cell door is opened and the ERT rushes in.

According to Plaintiff, upon entering Plaintiff's cell, Defendant immediately set aside his shield, punched Plaintiff "3 times in his right eye" and "one time in the nose," and then threw Plaintiff to the floor of his cell. (Pl.'s SOAF ¶¶ 26, 34).   Defendant disputes Plaintiff's version of

8

events and contends (without further elaboration) that Plaintiff was "escorted to the ground of his cell." (*See* Def.'s SOF ¶ 29; Def.'s SOAF Resp. ¶¶ 26, 34.)

Once Plaintiff was brought to the ground, approximately 90 seconds elapsed while the ERT applied restraints and brought Plaintiff to his feet. (Video 1 at 8:07-9:50.) The video at this point is largely obstructed—there is no clear view of Plaintiff's head/arms or Defendant's arms/hands—and the audio is difficult to discern. It is undisputed, however, that the ERT members verbally ordered Plaintiff multiple times to "stop resisting," to "cuff up," and to "give [me/them] your arm" during this time period. (*Id.; see also* Def.'s SOF ¶ 37.) The parties dispute whether Plaintiff screamed out "I can't breathe" at any point while the ERT members were in his cell. (*See* Pl.'s SOAF ¶ 28.) The audio evidence from the video recording is loud and chaotic at this point, and for the most part the court is unable to make a clear determination regarding Plaintiff's specific words or utterances.[8]

The parties also dispute whether Plaintiff complied with the ERT members' instructions after he was on the ground. (*See* Def.'s SOF ¶ 28; Pl.'s SOF Resp. ¶ 28.) According to Plaintiff, after the ERT entered his cell, he "voluntarily" put his hands behind his back so the ERT could place him in restraints. (Pl.'s SOAF ¶ 44.) According to Defendant, Plaintiff in fact tried to grab Defendant's arm to prevent him from securing Plaintiff in restraints. (Def.'s SOF ¶ 33.) Defendant further asserts that he had to apply joint manipulation to secure Plaintiff's wrist while he was on the ground because Plaintiff continued to be non-compliant with orders. (*Id.* ¶ 34.)[9] Plaintiff contends that Defendant slammed the left side of his face into the floor while he was lying

---

[8] At one point in the video, an ERT member instructs Plaintiff to "stop resisting" and Plaintiff clearly and calmly responds "I'm not," to which the ERT member replies "well, it looks like you are." (Video 1 at 9:13-9:18; *see also* Def.'s SOF ¶ 36.)

[9] Plaintiff disputes that Defendant applied joint manipulation, but admits that he does not know what the expression "joint manipulation" entails. (*See* Pl.'s SOAF ¶ 43; Pl.'s Mem. at 10.)

9

on his stomach; Defendant disputes this.  (Pl.'s SOAF ¶ 41; Def.'s SOAF Resp. ¶ 41.)  Both sides agree that Plaintiff turned his head "a few times" while he was on the ground with the ERT attempting to restrain him.  (Def.'s SOF ¶ 40.)

It is also undisputed that Plaintiff was injured during the course of the October 3, 2022, cell extraction.  The video shows Plaintiff with missing glasses, no mask, and blood on his face (over his left eye, under his nose, and near his right eye) when he is first brought to his feet outside his cell.  (Video 1 at 9:52.)  Contemporaneous medical records confirm that immediately after the October 3, 2022 cell extraction, Plaintiff had a bruised and swollen right eye and a small nosebleed.  (Def.'s SOF ¶ 39.)  Two days later, Dr. Marlene Henze ordered x-rays after examining Plaintiff and documenting Plaintiff's swollen nose and bruising around both of his eyes. (Pl.'s SOAF ¶ 27.)  Neither side has presented the results of the x-rays.

## MOTIONS TO STRIKE

As noted, many of the facts surrounding the October 2022 cell extraction are disputed. In his filings, Plaintiff has asked the court to disregard or strike portions of Defendant's factual submissions.  Plaintiff contends Defendant's July 22, 2025 declaration should be stricken because it was not disclosed during discovery.  ([132], addressing [112-6].)  Testimony of a witness that was not disclosed during discovery under Federal Rule of Civil Procedure 26(a) cannot be used to support a subsequent motion unless the violation of Rule 26(a) was "justified or harmless."  FED. R. CIV. P. 37(c)(1).  Plaintiff has argued, in addition, that certain facts included in the incident reports completed at or near the time of the October 3, 2022, cell extraction were intentionally falsified and should be disregarded; he has not, however, moved to strike these reports in their entirety.  The court recognizes that Plaintiff has not had the opportunity to depose Defendant, or to issue additional written discovery requests with respect to any new facts included in Defendant's declaration.  Nevertheless, the court finds no prejudice to

Plaintiff because, as discussed in detail below and as required, for purposes of summary judgment, the court credits Plaintiff's version of disputed events.

Plaintiff also seeks to strike a "Psychiatric Progress Note" submitted by David Sogbaike on October 4, 2022. ([136] addressing [112-4]). As Plaintiff correctly notes, the author of this report was not personally involved in Plaintiff's cell extraction, yet included a "narrative" and "disposition" purporting to detail these events in his report. Defendant contends that the report is nevertheless admissible as "a business record created in the normal course of business of providing mental health treatment to individuals in custody." ([140] at 3.) In the court's view, a narrative account of the cell extraction events, prepared by a non-participant, is unlikely to qualify as a business record. In any event, Defendant has taken no steps to authenticate this exhibit under Federal Rule of Evidence 803. The court therefore grants Plaintiff's motion to strike and will not consider the October 4, 2022, psychiatric progress notes in the analysis that follows.

**ANALYSIS**

Summary judgment is warranted where the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). To determine whether a genuine dispute of material fact exists, the court considers relevant, properly supported evidence in the light most favorable to the non-moving party. *Logan v. City of Chicago*, 4 F.4th 529, 536 (7th Cir. 2021). In conducting its analysis, the court refrains from making credibility determinations or weighing the evidence. *Fletcher v. Doig*, 145 F.4th 756, 764 (7th Cir. 2025) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Summary judgment is appropriate if, on the evidence provided, no reasonable juror could return a verdict in favor of the non-movant. *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012); *see Anderson*, 477 U.S. at 251–52. The moving party has the "ultimate burden of persuasion" to show entitlement to judgment as a

matter of law. *Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006).

Plaintiff's claims here arise under the Eighth Amendment, which states: "[E]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." *Whitley v. Albers*, 475 U.S. 312, 318 (1986). To establish cruel and unusual punishment, a plaintiff must prove that he or she was subjected to "the unnecessary and wanton infliction of pain" while in prison. *Id.* at 319. Application of this standard depends on "the kind of conduct against which an Eighth Amendment objection is lodged." *Id.* at 320. "[W]henever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 6–7 (1992).[10] This subjective inquiry applies any time the use of force is more than *de minimis*. *Lewis v. Downey*, 581 F.3d 467, 476 (7th Cir. 2009) ("What matters—and what will generally be the decisive factor in cases such as this—is the mindset of the individual applying the force.").

Because "direct evidence of intent rarely exists," several factors inform the court's inquiry, including "the need for force, the threat posed by the inmate as reasonably perceived by the responsible official, the relationship between the need for force and the amount of force used, and any efforts made to temper the severity of a forceful response." *Kind*, 140 F.4th at 366 (citations omitted). In conducting its review, the court may not substitute its own judgment for that of prison officials regarding "the reasonableness of a particular use of force or the existence

---

[10] In his briefing, Plaintiff at times appears to pursue two separate claims based on "excessive force" and "cruel and unusual punishment." (*See* Pl.'s Mem. at 1; Pl.'s Sur-Reply at 1.) This is a distinction without a difference. Whether referred to as "excessive force" or "cruel and unusual punishment," the court understands Plaintiff to be alleging that Defendant's conduct during the October 3, 2022, cell extraction violated his Eighth Amendment right to be free from the unnecessary and wanton infliction of pain.

12

of arguably superior alternatives." *Whitley*, 475 U.S. at 322. Put another way, force "does not amount to cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense." *Id.* at 319. To survive summary judgment, "the prisoner must have evidence that 'will support a reliable inference of wantonness in the infliction of pain.' " *Fillmore v. Page*, 358 F.3d 496, 504 (7th Cir. 2004) (quoting *Whitley*, 475 U.S. at 322); *see also Lewis*, 581 F.3d at 476 ("[w]hat matters . . . is the mindset of the individual applying the force").

In this case, Plaintiff acknowledges that he refused orders to "cuff up" when the ERT was outside his cell. He agrees, further, that pepper spray was an appropriate use of force for purposes of effecting his transfer to segregation. (*See* Pl.'s Mem. at 23 ("Pepper spray is of course authorized, and considered a *de minimis* amount of force in most situations, and of course warranted in this situation since the Plaintiff only refused orders to go to segregation."); (Pl.'s Final Reply [148] at 2 ("The Plaintiff doesn't allege the use of pepper spray or verbal commands are what's excessive.").) Plaintiff also concedes that a forced entry into his cell was required when the pepper spray proved to be ineffective. (Pl.'s Final Reply at 1 ("obviously the Plaintiff refused orders to 'cuff up' prior to his cell being entered"), and at 2 ("of course 'force' had to be used" up until the point "Plaintiff's cell was entered officially"). The court therefore limits its analysis to the two discrete uses of force that occurred after the ERT entered Plaintiff's cell.

## A. First Use of Force: Punches to Plaintiff's Nose and Eyes

For purposes of its analysis, the court accepts as true Plaintiff's version of all properly disputed facts. Specifically, the court accepts that Defendant delivered three closed-fist punches to Plaintiff's right eye and one punch to his nose during the eight seconds after the ERT's entry into Plaintiff's cell. The video evidence in this case, along with Plaintiff's testimony and medical records, is also consistent with the type of injury that Plaintiff claims resulted from Defendant's

use of force. *Cf. Fillmore*, 358 F.3d at 504 ("[W]hile the video does not capture every second . . . [t]he portions showing Fillmore do not suggest that he was experiencing the level of discomfort that one would expect [if the plaintiff's version of events is accurate].").

Defendant argues that the video evidence proves that Defendant did not punch Plaintiff four times "in that extremely short timeframe." (Def.'s Memo [113] at 9; Def.'s Reply [143] at 3) ("The video footage conclusively established what force was used against Plaintiff.").) But the video evidence in this case does not provide a clear view of Defendant's arms and hands, or of Plaintiff's head and face, during the eight seconds immediately after the ERT enters Plaintiff's cell and before Plaintiff has become fully prone on the ground. Eight seconds is a short time, but it is not physically impossible for Defendant to have delivered the disputed blows in rapid succession. Because the video evidence does not "firmly settle[]" this disputed question of material fact, the court applies regular rules of deference in favor of the non-movant. *Kind*, 140 F.4th at 363.

Even so, accepting Plaintiff's version of the disputed facts, at the time Defendant entered Plaintiff's cell there was an indisputable need for the ERT to utilize some amount of force to effect the transfer order. In the events leading up to that moment, Plaintiff had: (1) refused to voluntarily transfer to segregation earlier that same day; (2) outfitted himself with a mask and gloves in advance of the ERT's approach; (3) used his mattress to block the effects of pepper spray; (4) defied numerous direct orders to "cuff up" for purposes of transferring to segregation; and (5) stood facing the ERT in a combative stance before physically tussling with ERT members when they attempted to enter his cell. Prison staff are not required to "leave the inmate alone if he chooses not to obey a particular order" or to simply "wait him out," but instead may compel compliance with verbal orders by using physical force. *Soto v. Dickey*, 744 F.2d 1260, 1267 (7th Cir. 1984); *see also Lewis*, 581 F.3d at 476 ("Inmates cannot be permitted to decide which orders

14

they will obey, and when they will obey them." (quoting *Soto*, 744 F.2d at 1267)).   Nothing about Plaintiff's demeanor or actions suggested that he planned promptly to become compliant once the ERT succeeded in entering his cell.   The court therefore agrees with Defendant's assessment that Plaintiff's own actions "required the ERT to enter Plaintiff's cell and use force to gain compliance to put Plaintiff in restraints to be escorted to restricted housing."   (Def.'s Mem. at 7.)

Whether Plaintiff posed an ongoing threat at the point when Defendant entered his cell is somewhat uncertain.   On one hand, this is not a case in which Plaintiff was already restrained and no longer a threat.   *See, e.g.*, *Thomas v. Stalter*, 20 F.3d 298, 302 (7th Cir. 1994) ("while [plaintiff] was immobilized . . . [defendant], with a clenched fist, drew back and came down and hit [plaintiff] in the mouth.   [Defendant] then said, 'Shut up.' ") (cleaned up).   Nor, on the other hand, is it a case in which Plaintiff was actively punching and kicking Defendant or other members of the ERT.   *See King v. Spears*, No. 16-cv-144, 2019 WL 632290, at *4–5 (W.D. Wis. Feb. 14. 2019) (plaintiff can be seen on video throwing one officer off the bed, pushing another to the other side of his cell, and generally "counterattacking" while yelling comments such as "come 'get you some bitch' ").   But immediately prior to Defendant's use of force, Plaintiff here had engaged in at least one act of physical resistance by blocking the doorway to his cell and by grabbing the pepper spray can held by Corey Walker.   He remained unrestrained and had refused multiple orders to voluntarily "cuff up."   The court cannot conclude as a matter of law that Plaintiff posed no threat once Defendant had entered his cell.   *Cf. Lewis,* 581 F.3d at 477 ("At the time he was shot [with a taser], Lewis asserts that he was merely lying on his bunk, weak and sluggish from more than ten days without food.").

Plaintiff argues that if force was necessary, the *amount* of force used under the circumstances was excessive.   In Plaintiff's words, Defendant "could've just thrown the Plaintiff to the floor of his cell."   (Pl.'s Mem. at 21–22.)   Perhaps; but it is not the court's job to second-

15

guess the reasonableness of a particular use of force or weigh alternatives. *Whitley*, 475 U.S. at 322; *see also Lee v. James*, No. 21-1114, 2021 WL 3197514, at *3 (7th Cir. July 29, 2021) ("[T]he infliction of pain to maintain order is not excessive simply because the use of force in retrospect appears unnecessary."). The court also need not accept Plaintiff's hypothetical argument as fact. What amount of force would have been necessary "in the strict sense" to subdue Plaintiff is uncertain, but that is not the question before the court. *Whitley*, 475 U.S. at 319. For Plaintiff to survive summary judgment, he must show that the use of force was "so disproportionate to the risks that it could not 'plausibly have been thought necessary' and 'instead evidence[s] such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur.'" *Kind*, 140 F.4th at 369 (quoting *Whitley*, 475 U.S. at 321). The blows from Defendant were undoubtedly painful and injurious. At the same time, they were also limited in number and duration. Standing alone, the injuries are Plaintiff suffered are not enough to support a conclusion that Defendant had a malicious and sadistic mindset to cause harm rather than an intent to maintain or restore discipline.

Plaintiff argues that Defendant's malicious and sadistic intent can be inferred from other facts in the record,[11] including Defendant's failure to comply with IDOC Administrative Directive

---

[11] Without citing any facts in the record, Plaintiff further asserts that he was forced to use his same mattress (now covered in "smothered in human waste, blood, and pepper spray") after being relocated to segregation, and that his dirty mattress "is an example 'giving sight' into the Defendant's state of mind, and malicious and sadistic intent to cause even more harm and pain unto the Plaintiff than has already been done." (Pl.'s Mem. at 30.) Plaintiff has disclaimed any intent to assert a separate Eighth Amendment claim related to his mattress, whether a conditions of confinement claim or an excessive force claim. (*See* Pl.'s Mem. at 2 ("the Plaintiff doesn't make a claim surrounding that"); *id.* at 30 ("The Plaintiff again does not allege that his mattress […] [is] what he's staking his Cruel and Unusual Punishment Claim off of.").) Plaintiff argues that additional video evidence from JTC surveillance cameras would show Defendant going back to Plaintiff's cell to "grab" the soiled mattress. (Pl.'s Sur-Reply at 2.) Even accepting this as true, there is no evidence in the record showing that Defendant was responsible for Plaintiff's bedding after he arrived at his new cell in restrictive housing. The mere act of removing Plaintiff's mattress from his cell is irrelevant, as it suggests nothing about Defendant's mindset or motivation when using force against Plaintiff.

05.01.173 and his submission of a fabricated incident report. Plaintiff's argument that malice can be inferred by Defendant's decision to "surrender" his shield during the cell extraction, despite being assigned to the "shield position" on the ERT, is a non-starter. There is nothing in IDOC Administrative Directive 05.01.173 explicitly or implicitly requiring the officer in the position of "Shield 1" to hold his shield at all times during a cell extraction.

Plaintiff has a slightly stronger argument with regard to the ERT's collective failure to wait 5 minutes between each burst of pepper spray to see if Plaintiff would comply. Administrative Directive 05.01.173 instructs, "Unless exigent circumstances exist, the individual in custody shall be given 5 minutes between each order to comply prior to use of OC, chemical agents and/or impact munitions." (IDOC Administrative Directive 05.01.173, [135] at 51.) Violation of such a directive does not, on its own, violate the Constitution. *See Pulera v. Sarzant*, 966 F.3d 540, 551 (7th Cir. 2020). Defendant admits the ERT did not wait five minutes between each burst of pepper spray, (Def.'s SOAF Resp. ¶ 38), and Plaintiff contends the violation is evidence of Defendant's malicious intent. The court notes that using pepper spray at all is evidence of the officers' attempts to gain Plaintiff's compliance without additional force. It may be that prolonging this activity would have encouraged Plaintiff to comply; but Plaintiff had made efforts to ensure the pepper spray would not be effective (covering his chuckhole with his mattress and donning gloves and a mask). Even so, the ERT spent approximately four minutes attempting to see if they could get Plaintiff to cooperate before physically entering Plaintiff's cell. The court finds that no reasonable juror could infer malice based on Defendant's deviation from the Administrative Directive under these circumstances.

That leaves the question of Defendant's allegedly falsified report. Plaintiff disputes several statements in that report: (1) that Plaintiff threw a cup filled with unknown substance toward the ERT when they first approached his cell; (2) that Plaintiff was observed standing at his

17

door holding a second cup filled with an unknown substance;[12] (3) that Plaintiff threw this second cup of unknown substance at the ERT members when they entered his cell; (4) that Plaintiff attempted to force his way out of his cell; (5) that Defendant used his shield to escort Plaintiff to the ground; (6) that Plaintiff grabbed Defendant's arm in an attempt to prevent the application of restraints; and (7) that Defendant applied joint manipulation to maintain control of Plaintiff's wrist. It is well settled that the court cannot make credibility decisions or weigh conflicting evidence at the summary judgment stage. *Anderson*, 477 U.S. at 255. In *Outlaw v. Newkirk*, 259 F.3d 833, 838–41 (7th Cir. 2001), the Seventh Circuit affirmed summary judgment despite a significant discrepancy between an officer's incident report and his subsequent affidavit, on the issue of whether plaintiff threw garbage at the officer or merely placed it in the "cuffport." The court concluded summary judgment was appropriate because there was no excessive force claim and no *material* disputed question of fact. *Id.* at 840. In the case before this court, Plaintiff offers evidence of Defendant's purported dishonesty in support of an element of his claim—that Defendant acted with malicious and sadistic intent to cause harm. Making an untruthful statement in an official report is improper at best, but the court does not believe that an attempt to cover up Defendant's alleged wrongdoing by submitting a falsified report after the fact by itself is evidence of the officer's subjective state of mind at the time the force was actually used.

---

[12]     In his declaration, Plaintiff states that he did not have "fecal matter" in his possession "prior to the cell extraction on 10-3-22" and "never held a cup of any 'substance' inside of [his] cell prior to, or during the cell extraction." (Pl.'s Decl. [134] ¶¶ 2,4.) Plaintiff also contends that his mattress was "smothered" in human waste at the conclusion of the cell extraction. *See supra* n.11; (*See also* Pl.'s Dep. [112-1] at 19:11-17 ("My mattress was brought to me that I still use from the cell extraction and it was covered in blood from having been punched in my nose when it started leaking all over the floor and the mattress. It was covered in mace from the times I was pepper-sprayed and it had feces on it."); *id.* at 19:24 (describing the mattress as "covered in blood, mace and feces"). Plaintiff makes no attempt to explain why his mattress was covered in feces or where the feces came from. This factual question, like many others, goes to Plaintiff's overall credibility and cannot be resolved at the summary judgment stage.

18

Because the court credits Plaintiff's version of events, here, as in *Outlaw*, whether Defendant lied in his report is not material to the court's resolution of Plaintiff's excessive force claim.

Defendant's actions do not exist in a vacuum. Plaintiff had multiple opportunities to comply with officers' orders. Regrettably, he chose a course of conduct that required his relocation by physical force. When ERT members attempted to enter his cell, he physically grappled with them, in no way demonstrating an intent to become compliant once they successfully forced their way in. Taking into consideration all of the relevant factors, and viewing the evidence in the light most favorable to Plaintiff, the court finds that Defendant's decision to deliver closed-fist punches immediately after entering Plaintiff's cell does not support "a reliable inference of wantonness" under the circumstances. *Whitley*, 475 U.S. at 322. Defendant is entitled to summary judgment on this first use of force.

### B. <u>Second Use of Force: Slamming the Side of Plaintiff's Face Into the Floor</u>

Analysis of Plaintiff's claim regarding Defendant's second use of force is more complicated. Again, the court accepts as true Plaintiff's version of all properly disputed facts, including Plaintiff's contention that Defendant slammed his face into the floor while Plaintiff was lying on the floor of his cell. Under Plaintiff's version of events, after the ERT entered his cell, he voluntarily put his hands behind his back so the ERT could place him in restraints. Defendant argues that "[i]t is highly unlikely that if Plaintiff was being compliant and willingly placed his hands behind his back, that the ERT members would feel the need to continue giving Plaintiff orders." (Def.'s Mem. at 10.) Defendant further argues that, at the very least, it *looked like* Plaintiff was resisting. (*Id.*) Defendant's arguments on the point may be sufficient to persuade a jury; however, as previously noted, the court cannot resolve disputed questions of fact in Defendant's favor at the summary judgment stage. Again, the video evidence does not firmly settle the question of whether Plaintiff was actually complying after he was restrained. Any view of

Plaintiff's head, face, arms, and torso is blocked by ERT officers. It is undisputed that Plaintiff's head was not fully restrained while he was lying prone on the floor of his cell, as Plaintiff admits that he turned his head "a few times" while he was on the ground. (Def.'s SOF ¶ 40; *see also* Pl.'s Dep. [112-1] at 49:16-19 ("I turned my head a few times but when I initially fell and was thrown to the floor I was looking to the right").) But Defendant does not argue that there was anything aggressive about Plaintiff's head movement, nor that Plaintiff disregarded an order to stop moving his head.

The ongoing threat level was also lower than before. At this point in the cell extraction, Plaintiff was lying prone with multiple officers holding him down. The effects of the pepper spray and/or Defendant's punch to his nose were also being felt by Plaintiff, and he "scream[ed out" that he could not breathe. (Pl.'s SOAF ¶ 28.) Whether Plaintiff was still able to move his head and arms when Defendant slammed Plaintiff's face into the floor is not clear, but the video evidence suggests that although the situation remained volatile, it was swiftly coming under the officers' control. A reasonable jury could find there was no need to apply force directly to Plaintiff's head at this point in the cell extraction and that Plaintiff posed no threat to the ERT members.

The court recognizes that Plaintiff's injuries are comparatively minor. In addition to the injuries resulting from punches to Plaintiff's right eye and nose, the video evidence shows Plaintiff suffered small scrapes or abrasions over his left eye, injuries not significant enough to be documented in any of the medical records provided to the court. If a jury concludes that some amount of additional force was warranted, the jury may also conclude that the amount used here was not more than "could plausibly have been thought necessary." *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (quoting (quoting *Hudson*, 503 U.S. at 7). *See Lunsford v. Bennett*, 17 F.3d 1574, 1582 (7th Cir. 1994) (though significant injury is not necessary to establish excessive force in violation of the Eighth Amendment, minor injuries suggest force used was not maliciously

20

intended to cause pain); *see also Hendrickson v. Cooper*, 589 F.3d 887, 891 (7th Cir. 2009) ("[I]f an officer's use of force causes only minor injury, that factor tends to show that the force served a proper disciplinary purpose . . . [and] the lack of serious injury may tip the scales against the prisoner.").

Injury and force are, however, "only imperfectly correlated," *Wilkins*, 559 U.S. at 38, and the infliction of pain is *per se* malicious if it is done "totally without penological justification." *Fillmore*, 358 F.3d at 504 (*quoting Hope v. Pelzer*, 536 U.S. 730, 737 (2002)). Drawing all inferences from this record in favor of Plaintiff, there are genuine issues of material fact regarding Defendant's state of mind in the second use of force in this case. This portion of the claim survives summary judgment. *See Lewis*, 581 F.3d at 478.

### C. <u>Failure to Intervene</u>

Finally, Plaintiff brings a separate claim alleging that Defendant failed to intervene when force was applied against Plaintiff during the October 3, 2022, cell extraction. His argument is as follows: "Yes, Edcar Walker is the sole Defendant in this matter, but since an Edward Hernandez was also inside of the Plaintiff's cell with Edcar Walker when the Plaintiff was restrained, a jury may find that the Defendant Edcar Walker was not the one to exert excessive force upon the Plaintiff, and <u>rather</u> Edward Hernandez did. If that's the case, then a failure to intervene claim is very appropriate for this situation." (Pl.'s Mem. at 28 (emphasis in original) (citation omitted).)

The parties dispute whether Plaintiff properly exhausted his failure to intervene claim as required by the Prison Litigation Reform Act, but the court need not reach the issue. There is no evidence that Edward Hernandez punched Plaintiff four times or slammed his face into the floor of his cell. Plaintiff has consistently testified that it was Defendant Edcar Walker who engaged in this conduct. In short, there is no admissible evidence of any unconstitutional use of force by

21

Edward Hernandez that Defendant had an obligation to prevent. Where there is "no violation that compelled intervention" in the first place, there can also be "no constitutionally impermissible failure to intervene." *Fillmore*, 358 F.3d at 506.

## CONCLUSION

Defendant's motion [111] is granted in part and denied in part. This case is set for a telephone status hearing on 4/1/2026 at 9:30 a.m. to discuss next steps in this case. As Plaintiff's damages appear to be relatively modest, the court encourages the parties to discuss the possibility of settlement.

ENTER:

Date: March 17, 2026

REBECCA R. PALLMEYER
United States District Judge